1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKI METZGER, | )  1:04cv5983 DLB |
| | ) |
| | ) |
| Plaintiff, | )  ORDER REGARDING PLAINTIFF'S |
| | )  SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| JO ANNE B. BARNHART, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **BACKGROUND**

Plaintiff Vicki Metzger ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  On December 22, 2004, the Honorable Oliver W. Wanger reassigned the case to the undersigned for all purposes.

1

<u>**FACTS AND PRIOR PROCEEDINGS**</u>[2]

Plaintiff filed an application for disability insurance benefits on May 21, 2002, alleging disability since June 1, 1994 due to fibromyalgia.  AR 73-75, 78-87.  After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 59-62, 64-67, 68.  On January 8, 2004, ALJ Edward Graham held a hearing.  AR 29-56.  On February 17, 2004, ALJ Graham found that Plaintiff was not disabled.  AR 11-19.  The Appeals Council denied review on May 21, 2004.  AR 5-7.

<u>Hearing Testimony</u>

On January 8, 2004, ALJ Graham held a hearing in Lancaster, California.  AR 29.  Plaintiff appeared with her attorney, Brian Reed.  AR 29.  Vocational expert ("VE") Ruth Arnush also appeared and testified.  AR 29.

Plaintiff testified that she has a GED and some college experience.  AR 33.  She was last employed at a mini mart until the business closed in 1995.  AR 33-34.

Prior to November 30, 1999, she had carpal tunnel surgery on both hands.  AR 34.  She also had headaches, memory problems, and pain everywhere.  AR 34.  She was unable to stand for long periods of time because of pain in her back.  AR 35.  She also had pain radiating from her back to her heels, in both legs.  AR 35.  She suffered from depression from the pain.  AR 35.

She explained that she would get headaches every day, brought on by stress.  AR 36.  She had memory problems on a daily basis.  AR 38.  She experienced pain in her arms, shoulders, and hands almost daily, and rated the pain as a 7-8 on a scale of 1-10.  AR 39.  Stress brought on the pain.  AR 39.  The severity of the pain changed from day to day.  AR 39.  The pain affected her ability to grasp.  AR 40.  She also experienced tingling, burning, and numbness in her hands.  AR 40.

Plaintiff also testified that she suffered from pain in her legs, including burning and aching.  AR 41.  Her right side is worse than her left.  AR 41.  She also described pain in her lower back, on the right side, caused by degenerative disc disease.  AR 42.  She explained that,

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1   prior to 1999, she didn't get much medication for her pain because her doctors were more

2   interested in testing her for psychological problems.  AR 44.

3          She also had problems sleeping because of the pain.  AR 44.  She would go days without

4   sleeping, and then sleep for 2-3 days at a time.  AR 44.  In 1999, she had trigger points across her

5   shoulder and up and down her spine.  AR 45.  She had problems with her blood pressure, but

6   only when her pain was excruciating.  AR 45.  Her blood pressure would return to normal after

7   she took pain medication.  AR 45.

8          She had problems with lack of coordination and explained that she would stumble a lot

9   and had balance problems.  AR 45.  She also could not handle the heat, which would make her

10  ill.  AR 45.  She had anxiety and panic attacks in 1999, also.  AR 45.  Her pain interfered with

11  her ability to concentrate.  AR 46.  Although she takes pain medication today, she was not taking

12  any in 1999.  AR 46.

13         In 1999, Plaintiff estimated that she could stand and/or walk for about two hours in an

14  eight hour period.  AR 47.  She thought she could sit for about two hours.  AR 47.  She could lift

15  about five pounds on a regular basis.  AR 48.  Her normal activities included cleaning,

16  vacuuming, cooking, doing laundry, driving a car, and going to the grocery store.  AR 48.  She

17  also shopped at retail shores.  AR 48.  She went to restaurants and movies and socialized with

18  friends.  AR 48.

19         From 1995 to 1999, she was hospitalized for a hysterectomy, gall bladder removal, and

20  carpal tunnel surgery on both hands.  AR 49.  She could not remember the exact date of her

21  hysterectomy.  AR 50.

22         The ALJ questioned why Plaintiff waited eight years after she stopped working to file for

23  benefits.  AR 50.  She explained that her doctor was trying to make her believe that it was all in

24  her head, and that once she was diagnosed with fibromyalgia, she decided to file for benefits.

25  AR 50.  She didn't know that you could file for benefits based on a mental disorder.  AR 50.

26         VE Ruth Arnush testified that Plaintiff's past relevant work as convenience store manager

27  was light, skilled work.  AR 52.  Her past work as police dispatcher was sedentary and semi-

28

1  skilled.  AR 52.  Her past work as bank teller was light, skilled work.  AR 52.  Her past work as

2  cashier was light, semi-skilled work.  AR 53.

3        The ALJ asked the VE to assume a person of Plaintiff's age, education and past relevant

4  work experience, who could perform light work with mild pain, but would be mildly limited in

5  understanding and remembering tasks, in sustained concentration and persistence, and

6  functionally interacting with the general public.  AR 53.  This person could perform all of

7  Plaintiff's past relevant work.  AR 53.  If this person was limited to sedentary work, only the job

8  of dispatcher would be available.  AR 53.

9        Unskilled, light jobs which allow for a mild mental limitation include cashier, outside

10  deliverer, and shoe packer.  AR 54.  At the sedentary level, this person could perform jobs such

11  as glass waxer, almond blancher and finisher.  AR 54.  If this person was markedly limited in

12  mental activities, it would eliminate all jobs.  AR 54.

13      <u>Medical Record</u>

14        Plaintiff was treated for lumbar spasms in 1992 and 1993.  AR 751-765.  An x-ray of the

15  lumbosacral spine revealed an old minimal compression fracture at L2.  AR 765.  Plaintiff was

16  also treated for carpal tunnel syndrome in 1992 and underwent bilateral carpal tunnel surgery.

17  AR 694-696, 699, 706-708.

18        In August 1994, Plaintiff was diagnosed with sciatica, but her depression was noted as

19  stable.  AR 581.

20        In September 1994, L. Janumpally, M.D., reported improvement with Plaintiff's bilateral

21  carpal tunnel release surgery.  AR 503.  He did not note any focal weakness, although Plaintiff

22  complained of numbness and weakness.  AR 503.  He also noted a mild degree of L4-5

23  radiculopathy on the right and a moderate degree of sacroiliac joint arthritis.  AR 503.  An

24  October 1994 electromyography of both lower extremities was normal with no evidence of

25  peripheral neuropathy.  AR 502.  Dr. Janumpally noted that the EMG did not reveal lumbar

26  radiculopathy.  AR 502.

27        Plaintiff was seen at the Antelope Valley Hospital for back pain in February 1995.  AR

28  209.  She was treated with a facet block injection. AR 212.

1    By May 1995, Plaintiff's complaints were limited to diarrhea and heartburn.  AR 554.

2  Mary McCoy Toft, M.D., diagnosed Plaintiff with chronic anxiety and depression, campylobacter

3  colitis, GERD, chronic pain syndromes, and obesity.  AR 554.  Dr. Toft advised Plaintiff to lose

4  weight.  AR 554.

5    _____In June 1996, Plaintiff complained of back spasms without sciatic tenderness, and carpal

6  tunnel recurrence which was treated with medication.  AR 518.

7    _____In September 1996, Plaintiff was admitted to the Antelope Valley Hospital for severe

8  abdominal pain, probable ureteral colic.  AR 150-151.  On September 19, 1996, she underwent a

9  surgical procedure to remove the stone.  AR 253.

10    _____On March 4, 1997, Plaintiff underwent a stress test.  AR 199.  The test was negative.  AR

11  200.

12    _____Treatment records from Lakeside Medical Center from April 1997 to November 1998

13  document that Plaintiff was treated for obesity, back pain, hypertension, carpal tunnel syndrome,

14  chest wall pain, heartburn, sinusitis, and post-emergency room and hospitalization follow-up

15  treatment.  AR 298-314.

16    _____On August 26, 1997, Plaintiff was treated at the Antelope Valley Hospital emergency

17  room for complaints of severe upper right quadrant abdominal pain.  AR 148.  An ultrasound was

18  technically suboptimal due to Plaintiff's large body hiatus.  AR 197.  She was diagnosed with

19  severe abdominal pain, possible common bile duct stone.  AR 149.

20    _____Plaintiff sought mental health treatment with D.V. Pillai, M.D, between September 1997

21  and January 1999 for recurrent major depression, obsessive compulsive disorder, and past

22  traumatic stress disorder with moderate family and occupational problems.  AR 364-372.  She

23  was initially evaluated on September 16, 1997, and Dr. Pillai noted that she frequently moves

24  furniture and is a "cleanliness freak."  AR 372.  By October 1997, her obsessive compulsive

25  symptoms were minimal with medication.  AR 370.  However, on December 11, 1997, Dr. Pillai

26  noted that her obsessive compulsive disorder was still evident as she was still moving things

27  around.  AR 369.

28

_____On December 17, 1997, Plaintiff was seen at the Antelope Valley Hospital emergency room for complaints of acute shortness of breath experienced while putting clothes into the dryer. AR 145.  A chest x-ray revealed that her heart was slightly enlarged with the image of a prominent left ventricle.  AR 226.  An EKG study revealed sinus tachycardia, but was otherwise normal.  AR 235.  She was discharged with acute supraventricular tachycardia, resolved.  AR 147.

_____In January 1998, Dr. Pillai noted that her obsessive compulsive symptoms still persisted. AR 369.  By February, her symptoms had worsened, with Plaintiff repainting her house and rearranging furniture.  AR 368.  She had stopped her medication "cold turkey."  AR 368.

_____In March 1998, Plaintiff was treated at Antelope Valley Hospital for a peritoneal abscess. AR 143-144.  An abdominal CT scan was essentially normal.  AR 141-142.  She was discharged with diagnosis of abdominal wall pain and hypertension.  AR 144.

_____In August 1998, Plaintiff's obsessive compulsive symptoms increased while she was in the process of moving.  AR 366.  In October, her symptoms were worse but she had no depression.  AR 365.

_____In January 1999, Plaintiff's symptoms were increased again when she filed for bankruptcy.  AR 364.  However, her crying spells were decreased and no medical problems were noted.  AR 364.  No further mental health treatment is noted until August 2001.

_____Treatment records dated February 1999 to December 2000 from the Antelope Valley Family Health Medical Group document that Plaintiff was treated for radiating back pain, intermittent hypertension, and urinary tract infections.  AR 374-418, 773-784.  An MRI of Plaintiff's lumbar spine taken on April 2, 1999 revealed degenerative disc disease and disc bulges.  AR 786-787.

In August 1999, Plaintiff was diagnosed with myalgia, but there was no trigger point tenderness.  AR 415.  Flexion was limited due to her obesity.  AR 415.  Plaintiff weighed 285 pounds and was 5'9" tall.  AR 415.  By September 1999, her myalgias were decreasing.  AR 413.
_____

1    _____In October 1999, after hurting her ankle while out on her nightly walk, Plaintiff was seen

2    at the Lancaster Community Hospital emergency room.  AR 249.  X-rays revealed a lateral

3    malleolus fracture to the left ankle.  AR 250, 291.

4    _____Plaintiff was seen at the Antelope Valley Hospital in November 1999 for hypertension.

5    AR 179.  Repeat EKG studies were normal.  AR 234-235.  Her weight was 280 pounds.  AR 409.

6    _____Plaintiff was treated at the Lancaster Community Hospital emergency room in December

7    2000 for a headache and numbness in her face and chest.  AR 246.  A chest x-ray revealed an

8    enlarged heart, but no evidence of heart failure or pneumonia.  AR 289.  A brain CT scan was

9    negative.  AR 290.  She was diagnosed with transient hypertension and discharged.  AR 247.

10   A December 11, 2000 x-ray of Plaintiff's lumbosacral spine revealed degenerative

11   osteophytes.  AR 327.

12   _____In January 2001, Plaintiff was admitted to Antelope Valley Hospital after she experienced

13   a high heart rate and chest pressure at her doctor's office.  AR 138.  Two sets of cardiac enzymes

14   were negative and a chest x-ray showed no abnormalities.  AR 218.  She was discharged the next

15   day.  AR 138.  She was diagnosed with possible coronary artery disease, hypertension and

16   obesity.  AR 138.

17   _____On January 11, 2001, Plaintiff again complained of body pain.  AR 400.  She was

18   diagnosed with costochondritis.  AR 400.

19   _____Plaintiff returned to the Antelope Valley Hospital in May 2001 complaining of abdominal

20   pain, high blood pressure and difficulty breathing.  AR 158-167.  An ultrasound of her abdomen

21   was normal.  AR 168.  A chest x-ray revealed cardiac enlargement with the image of a prominent

22   left ventricle.  AR 171.

23   In August 2001, Dr. Pillai noted that Plaintiff was eating and sleeping better and wasn't

24   having any problems with her medications.  AR 363.  Her affect was bright and her obsessive

25   compulsive symptoms were improving.  AR 364.  He noted somatically focused chronic pain.

26   AR 363.

27

28

On December 31, 2001, Plaintiff was seen at Lancaster Community Hospital for complaints of chest pain and numbness in both arms and hands. AR 255. A chest x-ray was negative. AR 278.

In January 2002, Plaintiff was seen at the Antelope Valley Hospital for complaints of right knee pain. AR 155. An MRI of her right knee ruled out a tear. AR 158-159.

D. Griego, F.N.P., completed an undated Physician Statement in which she opined that Plaintiff's activities were severely limited because of her fibromyalgia. AR 428-429.

On April 10, 2002, Plaintiff underwent an initial comprehensive pain management evaluation by S.A. Sadik, M.D. AR 442-443. He diagnosed fibromyalgia, lumbar disc disease, and obesity complicating these diagnoses. AR 443.

In September 2002, State Agency physician Elipidio Fonte, M.D., completed a Physical Residual Functional Capacity Assessment Form. AR 446-453. He opined that Plaintiff could lift 10 pounds occasionally and 10 pounds frequently, could stand/walk for at least two hours in an eight hour workday, could sit about six hours in an eight hour workday, and was unlimited in pushing/pulling. AR 447. She could occasionally climb, balance, stoop, kneel, crouch, and crawl. AR 448. On February 6, 2003, State Agency physician K. Quint, M.D., agreed with this assessment. AR 453.

On January 17, 2003, Plaintiff underwent a comprehensive mental evaluation by Leslie A. Roman, Ph.D. AR 457-461. She diagnosed anxiety disorder, not otherwise specified. AR 460. She expected her condition to improve with ongoing psychiatric intervention, medication compliance and motivation for change. AR 460.

On February 6, 2003, State Agency physician Harvey Biala, M.D., completed a Mental Residual Functional Capacity Assessment form. AR 480. He opined that Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, but was not significantly limited in any other area. AR 480-481. He concluded that Plaintiff could perform simple, repetitive tasks. AR 482.

1    ALJ's Findings

2    _____The ALJ determined that despite Plaintiff's fibromyalgia, she was not precluded from

3    returning to any of her prior occupations as listed.  The ALJ therefore determined that she was

4    not disabled at any time on or before December 31, 1999, the date she was last insured for

5    Disability Insurance Benefits.  AR 15.

6                                    **SCOPE OF REVIEW**

7         Congress has provided a limited scope of judicial review of the Commissioner's decision

8    to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

9    the Court must determine whether the decision of the Commissioner is supported by substantial

10   evidence.  42 U.S.C. 405(g).  Substantial evidence means "more than a mere scintilla,"

11   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

12   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975)*.  It is "such relevant evidence as a

13   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

14   401.  The record as a whole must be considered, weighing both the evidence that supports and

15   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

16   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

17   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

18   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

19   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

20   substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

21   Cir. 1987).

22                                       **REVIEW**

23        In order to qualify for benefits, a claimant must establish that he is unable to engage in

24   substantial gainful activity due to a medically determinable physical or mental impairment which

25   has lasted or can be expected to last for a continuous period of not less than 12 months.  42

26   U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

27   such severity that he is not only unable to do her previous work, but cannot, considering his age,

28   education, and work experience, engage in any other kind of substantial gainful work which

9

1   exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

2   The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

3   Cir. 1990).

4          In an effort to achieve uniformity of decisions, the Commissioner has promulgated

5   regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

6   C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3]  Applying this process in this case, the ALJ

7   found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

8   disability; (2) has an impairment or a combination of impairments that is considered "severe"

9   (fibromyalgia) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does

10  not have an impairment or combination of impairments which meets or equals one of the

11  impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) can perform her past

12  relevant work.  AR 18-19.

13         Plaintiff argues that the ALJ failed to properly (1) consider her obesity; (2) evaluate the

14  medical evidence; (3) evaluate her mental impairment; and (4) evaluate her pain.

## DISCUSSION

15

16  A.     Plaintiff's Obesity

17         Plaintiff contends that the ALJ failed to properly evaluate her obesity pursuant to SSR 02-

18  1p.  Plaintiff cites the evidence of her weight in the record and the alleged effects of her obesity.

19         Pursuant to SSR 02-1p, obesity must be considered throughout the sequential evaluation

20  process, including when determining an individual's RFC.  "The combined effects of obesity

21  with other impairments may be greater than might be expected without obesity."  SSR 02-1p.

22  The Ninth Circuit recently held that, pursuant to SSR 02-1p, the ALJ must consider obesity in

23  determining RFC based on the information in the case record.  *Burch v. Barnhart*, 400 F.3d 676,

24  683 (9th Cir. 2005).

25         Here, the ALJ noted Plaintiff's treatment for obesity at the Lakeside Medical Center.  AR

26  15.  He also described a notation in the record that Plaintiff's flexion was limited due to obesity.

27

28
       [3] All references are to the 2000 version of the Code of Federal Regulations unless otherwise noted.

1  AR 16.  He did not, however, find that the effects of Plaintiff's obesity, considered alone or in

2  combination with her other impairments, had any impact on her ability to work.

3       Despite Plaintiff's specific listing of alleged impairments, there is no evidence in the

4  record of any functional limitations cause by Plaintiff's obesity.  *See Burch*, 400 F.3d at 683.

5  Plaintiff points to her limited flexion in August 1999, and her inability to take clothes out of the

6  dryer without her heart racing.  She also contends, "with increased weight has also come severe

7  depression and chronic pain below."  Opening Brief, at 6.  These facts, however, do not

8  demonstrate that her obesity caused any functional limitations prior to her date last insured.

9  Moreover, there is no evidence that her inability to take clothes out of the dryer was due to her

10  obesity.  SSR 02-1p specifically provides that the ALJ will not make assumptions about the

11  severity or functional effects of obesity combined with other impairments, but rather must

12  evaluate each case based on the information in the case record.  Here, there is simply no evidence

13  that Plaintiff's obesity caused any functional limitations prior to December 31, 1999.

14  B.    Medical Evidence

15       Plaintiff next argues that the ALJ failed to properly evaluate the medical evidence.  She

16  contends that the ALJ improperly rejected the opinion of Plaintiff's treating source, D. Griego,

17  F.N.P., who submitted an undated assessment significantly restricting Plaintiff due to her

18  fibromyalgia.  She argues that the medical evidence shows that Plaintiff has had ongoing pain

19  and mental impairments for many years and that Ms. Griego's opinion was supported by the

20  longitudinal medical record.

21       As a threshold issue, the Court must determine whether Ms. Griego is an acceptable

22  medical source.  Respondent points out that the ALJ mistakenly referred to Ms. Griego as Dr.

23  Griego.  Ms. Griego is not a doctor, however, but is a family nurse practitioner.  Respondent

24  argues that she is therefore not an acceptable medical source and her opinion is entitled to less

25  weight.  20 C.F.R. § 404.1513(a); *Gomez v. Chater*, 74 F.3d 967, 970-971 (9th Cir. 1996).

26  However, a nurse practitioner who works in conjunction with a physician can constitute an

27  acceptable medical source.  *Gomez,* 74 F.3d at 971.  Plaintiff argues that Ms. Griego provided

28  treatment as a member of the medical team of the Pegasus Medical Group and is therefore an

11

1  acceptable medical source.  However, there is no indication that Ms. Griego, as a member of the

2  Pegasus Medical Group, worked in conjunction with any physician in providing Plaintiff's

3  treatment.  *Gomez*, 74 F.3d at 971 (finding a nurse practitioner to be an acceptable medical

4  source where she was closely supervised by a physician and consulted with the physician in

5  providing treatment to the claimant).

6      Even assuming that Ms. Griego's opinion was entitled to the weight afforded to a treating

7  physician opinion, the ALJ was correct in his analysis.  An ALJ may reject a contradicted treating

8  physician's opinion on the basis of clear findings that set out specific, legitimate, reasons for the

9  rejection.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The ALJ acknowledged her

10  restrictions but found that since she reports that the fibromyalgia diagnosis was made in January

11  2002 and that she didn't begin treating Plaintiff until May 2002, the assessment predates the date

12  last insured by over two years.  AR 17.  Indeed, the ALJ was correct in dismissing limitations

13  based upon Plaintiff's condition *after* her date last insured.  A Title II claimant has the burden of

14  proving that her disability began on or before the date her disability insurance expired.  *Tidwell v.*

15  *Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  Despite Plaintiff's citation to the longitudinal record,

16  there is nothing in Ms. Griego's assessment that indicates Plaintiff's limitations existed prior to

17  December 31, 1999.

18      Obviously, if the ALJ correctly discounted her opinion under a more heightened standard,

19  his analysis under a lesser standard would be proper as well.  Under either standard, then, the

20  ALJ properly rejected her opinion.

21      Plaintiff disputes the ALJ's finding that her fibromyalgia diagnosis was not made until

22  January 2002, years after the date last insured.  Although there is an assessment of fibromyalgia

23  in June 1995, there is no indication that Plaintiff had resulting functional limitations.  AR 552;

24  *Sample v. Schweiker*, 694 F.2d 639, 642-642 (9th Cir. 1982) (the existence of a disorder is not

25  *per se* disabling; there must be proof of an impairment's disabling severity).  Indeed, most of

26  Plaintiff's complaints prior to her date last insured involved her back, carpal tunnel syndrome, or

27  mental issues.  Moreover, by July 1995, her myalgia's were improving with Elavil.  AR 551.

28

1    There is also a notation from September 1999 that her myalgias were decreasing, and in August

2    1999, Plaintiff had no trigger point tenderness.  AR 413, 415.

3    C.    Plaintiff's Mental Impairments

4           Plaintiff disagrees with the ALJ's finding that she did not have a severe mental

5    impairment.  She contends that the ALJ improperly found that her mental impairment is not

6    constant, and improperly rejected the opinions of Dr. Pillai, the consultive psychologist and the

7    State Agency physicians.

8           At the second step of the sequential evaluation of disability, the ALJ determines whether

9    a claimant has a severe impairment or combination of impairments.  A severe impairment is one

10   that significantly limits the claimant's physical or mental ability to do basic work activities.  20

11   C.F.R. § 1520(c).  An impairment or combination of impairments is found "not severe" and a

12   finding of "not disabled" is made at this step when medical evidence establishes only a slight

13   abnormality or a combination of slight abnormalities which would have no more than a minimal

14   effect on an individual's ability to work. even if the individual's age, education, or work

15   experience were specifically considered (i.e., the person's impairment(s) has no more than a

16   minimal effect on his or her physical or mental ability(ies) to perform basic work activities).

17   SSR 85-28.

18          In the context of disability insurance benefits, an individual who applies for benefits after

19   expiration of insured status, for disability that prevents substantial gainful activity at the time of

20   the application, must show that the current disability has existed continuously since some time on

21   or before date last insured lapsed.  *Flaten v. Sec'y Health and Human Serv.*, 44 F.3d 1453, 1458

22   (9th Cir. 1995).

23          Here, the ALJ determined that Plaintiff's mental impairments were not severe.  In August

24   1994, Plaintiff was diagnosed with stable depression.  AR 16.  Plaintiff treated with Dr. Pillai

25   between September 1997 and January 1999 for recurrent major depression, an

26   obsessive/compulsive disorder and PTSD with moderate family and occupational problems.  AR

27   16.  Although her GAF score in September 1997 was 50/75, by October 1997, her symptoms

28   were minimal with medication and supportive therapy.  AR 16, 370.  Her symptoms increased in

1   August 1998, when Plaintiff was planning on moving, and again in January 1999, when she filed

2   for bankruptcy.  AR 16.   However, no further treatment is noted until August 2001.  AR 16.  The

3   ALJ concluded, "Consequently, I cannot find that the claimant's mental disorders were severe

4   fora 12-month period."  AR 16.

5          The evidence simply did not permit a finding that Plaintiff's mental impairments existed

6   *continuously* since some time on or before December 31, 1999.  Despite her diagnoses, the

7   record indicates numerous improvements throughout her treatment.  *Crane v. Shalala*, 76 F.3d

8   251, 254 (9th Cir. 1996).  Moreover, although the record describes her diagnoses and symptoms,

9   it does not indicate any functional limitations created by her mental impairments.  *Sample v.*

10  *Schweiker*, 694 F.2d 639, 642-642 (9th Cir. 1982).  In fact, in October 1998, it was specifically

11  noted that she had no depression.  AR 365.  Indeed, by August 2001, the next date she received

12  mental health treatment after January 1999, Dr. Pillai noted that Plaintiff was eating and sleeping

13  better and wasn't having any problems with her medications.  AR 363.  He also noted that her

14  affect was bright and her obsessive compulsive symptoms were improving.  AR 364.   Given this

15  inconsistent record, the ALJ's finding was proper.

16         Finally, Plaintiff's citation to authorities who examined her well after her date last insured

17  is not relevant.  The ALJ properly concluded that these opinions were not relevant to a disability

18  finding prior to December 31, 1999.  *Flaten v. Sec'y Health and Human Serv.*, 44 F.3d 1453,

19  1458 (9th Cir. 1995).

20  D.    Plaintiff's Pain

21  _____Plaintiff argues that the ALJ improperly rejected her pain testimony.  She contends that

22  the ALJ "twists the record," mischaracterized Dr. Pillai's notes, and improperly relied on certain

23  facts.

24         The ALJ is required to make specific findings assessing the credibility of plaintiff's

25  subjective complaints.  *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991).  In rejecting

26  the complainant's testimony, "the ALJ must identify what testimony is not credible and what

27  evidence undermines the claimant's complaints."  *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.

28  1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir.

1988)).  Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the

severity of her pain and impairments is unreliable, the ALJ must make a credibility determination

with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily

discredit claimant's testimony.  *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).  "The

ALJ may consider at least the following factors when weighing the claimant's credibility:

'[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or

between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and

testimony from physicians and third parties concerning the nature, severity, and effect of the

symptoms of which [claimant] complains."  *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789,

792 (9th Cir. 1997).  "If the ALJ's credibility finding is supported by substantial evidence in the

record, we may not engage in second-guessing."  *Id.*

Here, the ALJ rejected Plaintiff's pain testimony for many reasons.  He first noted that

Plaintiff had been "quite active" through at least December 1999 based on evidence that she

moves her furniture and sustained chest pain in May 1997 "while pushing a dune buggy."  AR

17.  Plaintiff argues that the ALJ improperly relied on her moving furniture because it was not

evident from the notes *who* was moving the furniture, and because the notations were meant as

descriptions of her symptoms, not of her physical ability.  While the notations may not have been

intended to describe her physical abilities, it does not change the fact that Plaintiff was able to

move furniture quite often.  AR 314, 368, 369, 372, 457.  Moreover, in January 2003, she told

the consultive psychologist, "I clean and move the furniture weekly."  AR 457.  Although this

comment doesn't explain who was moving furniture prior to January 2003, it indicates that it was

likely Plaintiff.  *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ is entitled

to draw inferences logically flowing from the evidence).  Plaintiff does not dispute the dune

buggy comment.

Next, the ALJ noted that in January 1999, Plaintiff re-injured her back when she fell off a

ladder trying to enter her locked home.  He also noted that Plaintiff fractured her ankle in

October 1999 while engaging in her nightly walk.  AR 17.  It was reasonable for the ALJ to

determine that Plaintiff's use of the phrase "nightly walk" suggests that it was a regular activity.

1    AR 17.  *Sample,* 694 F.2d at 642.  Again, regardless of the circumstances surrounding these

2    incidents, this evidence demonstrates that Plaintiff was relatively active prior to December 1999.

3    *Tidwell v. Apfel*, 161 F.3d at 602; *Thomas,* 278 F.3d at 958.  In any event, the Court must uphold

4    the ALJ's decision were the evidence is susceptible to more than one rational interpretation.

5    *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

6         The Court recognizes that Plaintiff's condition may "wax and wane," and that Plaintiff

7    cannot be penalized for attempting to live a normal life during the times she feels good.  Opening

8    Brief, at 17.  However, when viewed in conjunction with Plaintiff's testimony, during which

9    described almost constant pain, Plaintiff's actual activities are certainly proper areas of

10   consideration when analyzing her credibility.  AR 34-46

11        The ALJ then noted that he was "especially taken" by the fact that, although she alleged

12   disability since 1994, she did not file her disability claim until eight years later.  AR 17.  Plaintiff

13   claimed that she filed later because her doctors told her it was all in her head and they wouldn't

14   give her medication.  AR 50.  The ALJ noted this explanation but determined that it detracted

15   from her credibility, inferring that she did not file earlier because her condition was not disabling.

16   AR 17.  Again, the ALJ is entitled to make inferences logically flowing from the evidence.

17   *Sample,* 694 F.2d at 642.

18        Finally, the ALJ recalled Plaintiff's testimony that she had not worked since 1994, when

19   the mini-mart she managed closed.  AR 17.  Plaintiff's work record was a proper area of

20   consideration in evaluating her subjective complaints, and the ALJ could infer that perhaps

21   Plaintiff stopped working because of the closure, not because of a disability.  *See Drouin v.*

22   *Sullivan*, 966 F.2d 1255, 1258 (9th Cir. 1992) (ALJ properly considered the fact that claimant did

23   not lose her past two jobs because of pain).

24        The ALJ set forth a sufficiently specific credibility determination to allow the Court to

25   find that he did not arbitrarily reject Plaintiff's complaints.  His decision is supported by

26   substantial evidence.

27   ///

28   ///

1

## CONCLUSION

2      Based on the foregoing, the Court finds that the ALJ's decision is supported by

3 substantial evidence in the record as a whole and is based on proper legal standards.

4 Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

5 Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in

6 favor of Defendant Jo Anne B. Barnhart, Commissioner of Social Security and against Plaintiff,

7 Vicki Metzger.

8      IT IS SO ORDERED.

9      **Dated:   August 2, 2005         /s/ Dennis L. Beck**
3b142a
10      UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28